**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CANDICE WILHELM,

Plaintiff,

v.

BAM TRADING SERVICES, INC.,

Defendant.

No. 23 CV 14906

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Candice Wilhelm signed up for Defendant BAM Trading Services, Inc.'s online trading platform Binance.US to buy and sell digital assets in February 2021. As part of the account signup process, BAM prompted Wilhelm to allow it to collect her facial geometry. Wilhelm alleges that BAM's collection, storage, use, and disclosure of this biometric information violated Illinois's Biometric Information Privacy Act. BAM moves to compel arbitration and dismiss this case based on the arbitration agreement in its Terms of Use, which BAM says Wilhelm agreed to when she created her account and when it subsequently amended the Terms. Wilhelm contests that she ever agreed to the Terms when she created her account and that she was aware of subsequent amendments to them.

## I.    Facts

BAM operates Binance.US, an online platform that supports the trading of digital assets. [17-1] ¶ 7.[1] Wilhelm created a Binance account in February 2021. [17-1] ¶ 25. She last traded in May 2023 and last accessed her account in October 2023. [17-1] ¶ 62. As part of creating her account, BAM prompted Wilhelm to allow it to collect her facial geometry to verify her identity to access the application. [1-1] ¶ 3. Wilhelm alleges that BAM collected, retained, and disclosed her biometric information in violation of Illinois's BIPA, 740 ILCS §§ 14/15(a)–(b), (d). [1-1] ¶¶ 22–27, 36–50.

At the time Wilhelm created her account, the October 2020 Binance Terms of Use required all users and BAM to arbitrate any dispute related to the user's access to or use of the Binance platform. [17-4] at 19. The arbitration provision also provided that "[a]rbitration … be conducted in accordance with the rules of the American Arbitration Association." *Id*. All subsequent versions of the Terms included a similar arbitration provision. [17-2] at 37; [17-6] at 31; [17-7] at 32; [17-8] at 51; [17-9] at 37.

The October 2020 Terms also permitted BAM to "amend, supplement, and/or replace" the Terms "by posting on the Website or emailing to [the user] the revised terms and conditions, and the revised terms and conditions shall be effective at such time." [17-4] at 17. If the user did not agree to the revised terms, her sole remedy was

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1. The facts are taken from Wilhelm's complaint, [1-1], as well as exhibits and affidavits attached to the parties' briefs, [17-1]–[17-11], [23-1].

to terminate her use of BAM's services and close her account. *Id.* Every subsequent version of the Terms included a similar provision. [17-2] at 34; [17-6] at 28; [17-7] at 29; [17-8] at 47; [17-9] at 34.

BAM amended the Terms in September 2022 to contain a delegation provision, which required that all threshold issues relating to the validity and scope of the arbitration provision be resolved in arbitration. [17-7] at 32–33. Every version of the Terms since September 2022 has included a similar delegation provision. [17-2] at 37–38; [17-8] at 51; [17-9] at 38.

Wilhelm denies that she ever agreed to arbitrate any disputes with BAM. [23-1] ¶ 2 ("At the time of opening my Binance account to the present, I did not make any agreement to arbitrate any dispute I might have with Binance."). She also says that she "was not aware, and had no reason to be aware, that Binance created new Terms of Use" at any point after she created her account. [23-1] ¶¶ 3–10.

BAM moves to compel arbitration based on the August 2023 Terms of Use, which were in effect at the time Wilhelm filed her complaint in September 2023,[2] and to dismiss the case. [16]; [17] at 6 n.4.

## II.   Legal Standard

The Federal Arbitration Act mandates that courts enforce valid, written arbitration agreements, reflecting a federal policy that favors arbitration and places

---

[2] Wilhelm argues that her BIPA claims accrued before the August 2023 Terms or the filing of her complaint in September 2023, [23] at 3–4, implying that an earlier version of the Terms governs her claims. Whichever version applies to the merits of Wilhelm's claims, the Terms' contents are not at issue here. The question is whether Wilhelm assented to the Terms when she created her account and again when BAM updated the Terms.

arbitration agreements on equal footing with all other contracts. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443–44 (2006) (citing 9 U.S.C. § 2).

"To compel arbitration, a party must show (1) an agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal by the opposing party to proceed to arbitration." *Kass v. Paypal Inc.*, 75 F.4th 693, 700 (7th Cir. 2023). For purposes of this motion, the parties only dispute whether they made an agreement to arbitrate and delegate arbitrability. [17] at 6 n.2.

A party opposing arbitration bears the burden of identifying a triable issue of fact as to the existence of the arbitration agreement. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The opponent's evidentiary burden is akin to that of a party opposing summary judgment under Rule 56. *Id.* "[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* The opponent's evidence is to be believed and all justifiable inferences are drawn in her favor. *Id.*

When deciding whether the parties agreed to arbitrate, ordinary state-law principles that govern the formation of contracts generally apply. *Kass*, 75 F.4th at 701. The present issue, the parties agree, is governed by Illinois law. [17] at 13 n.9; [23] at 5.

For a contract to be enforceable, there must be mutual assent as to the contract's terms. *Urban Sites of Chi., LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 51. Whether parties have mutually assented to the terms of a contract is a

4

question of fact, determined by an objective standard. *Kass*, 75 F.4th at 701. "Only the parties' overt acts and the communications between them may be considered in determining whether and upon what terms they have entered into a contract." *Id.*

In the online context, "a person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016). So, "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." *Id.* at 1036. A website provides reasonable notice when "the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and … the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Id.* at 1034. This is a fact-intensive inquiry. *Id.* at 1034–35. Simply clicking a box does not indicate a person has notice of all contents on that page or content that requires further action (scrolling, following a link, etc.). *Id.* at 1035.

## III.  Analysis

### A.  Account Registration Agreement

BAM submits a screenshot of Binance's account creation page, which shows a required checkbox affirming the user was "over 18 years old and [they] have read, understand and agree to the Binance.US Terms of Use, Privacy Policy, and Biometric Data Policy." [17-3] at 2. "Binance.US Terms of Use" is in orange text hyperlinked to the document. *Id.*; [17-1] ¶ 20. While this screenshot shows Binance's registration page in 2023, [17-3] at 2; [17-1] ¶ 20 n.1, BAM's Chief Operations Officer's attests

5

that Wilhelm created her account using the same registration process. [17-1] ¶¶ 25–26. He also says that, since the creation of Binance, every user has had to affirmatively check the box confirming they have read, understood, and agree to the Terms to register an account and begin trading on the platform. [17-1] ¶¶ 18–23, 25–26.

Wilhelm argues that she never agreed to arbitrate disputes with BAM when she created her account. [23] at 7. But she presents no evidence that the website registration page did not contain a checkbox with the hyperlinked Terms clearly visible when she created her account. Left with the screenshot and unrebutted evidence that the registration page was materially the same when Wilhelm created her account, there is no genuine dispute of fact on which a jury could find that the website did not give a reasonable person notice that there were terms and conditions attached to the creation of a Binance account.

Wilhelm also argues that BAM has not presented evidence that she actually checked the box presented when creating an account. [23] at 7. But BAM's COO attests that Wilhelm "created a Binance.US account on February 13, 2021, and, in doing so, assented to the Terms by checking a box indicating that she agreed to the Binance.US Terms of Use," and that "a user can only create an account . . . [by] affirmatively checking [the] box." [17-1] ¶¶ 19, 25.

Wilhelm again presents no evidence to rebut this fact. Wilhelm says that she "did not make any agreement to arbitrate any dispute I might have with Binance" when she opened her account. [23-1] ¶ 2. This is a conclusory legal assertion

6

unsupported by any factual evidence. Wilhelm has failed to identify a genuine dispute of material fact over whether she agreed to the October 2020 Terms, including the arbitration clause and amendment process, when she created her Binance account.

### B.    Delegation Clause and Amended Terms

The arbitrability inquiry, *i.e.*, whether the dispute falls within an arbitration agreement's scope, is ordinarily "an issue for judicial determination[,] [u]nless the parties clearly and unmistakably provide otherwise." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Through a delegation clause, parties may manifest such clear and unmistakable intent "to have an arbitrator decide … gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67–68 (2019) (internal quotations and citations omitted). That said, even "the most sweeping delegation" clause, as BAM argues there is here, "cannot send the contract-formation issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate." *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022). A delegation clause is "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Henry Schein*, 586 U.S. at 68. If a valid arbitration agreement exists, and "the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.* at 69.

Clear and robust language may, in and of itself, sufficiently demonstrate the requisite intent to delegate arbitrability questions to an arbitrator. *See Rent-A-*

*Center*, 561 U.S. at 69 n.1. Alternatively, most federal courts hold that incorporation of the rules and procedures of the American Arbitration Association constitutes clear and unmistakable evidence of a delegation clause. *See, e.g.*, *Grabowski v. PlatePass, L.L.C.*, No. 20 C 7003, 2021 WL 1962379, at *3 (N.D. Ill. May 17, 2021) (collecting cases); *Walton v. Uprova Credit LLC*, No. 23-cv-00520, 2024 WL 1241836, at *4 (S.D. Ind. Mar. 21, 2024); *cf. Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir. 1976) ("The agreement of the parties to have any arbitration governed by the rules of the AAA incorporated those rules into the agreement."). Under the AAA rules, the arbitrator retains explicit authority to resolve arbitrability disputes. AAA Consumer Arb. R. 14 ("The arbitrator shall have the power to rule on ... any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.").

The October 2020 Terms refers to and incorporates the AAA rules, requiring any arbitration "be conducted in accordance with the rules of the American Arbitration Association." [17-4] at 19. All subsequent versions of the Terms similarly incorporated the AAA rules. [17-2] at 37; [17-6] at 31; [17-7] at 32; [17-8] at 51; [17-9] at 37. Though the Seventh Circuit has not yet addressed this question, I find the majority rule persuasive. The incorporation of AAA rules in the October 2020 Terms sufficiently demonstrates the requisite intent to delegate arbitrability questions to an arbitrator.

Even if incorporation of the AAA rules were insufficient, there is no genuine issue of material fact that Wilhelm later assented to an explicit delegation clause in

the September 2022 and August 2023 Terms. BAM's COO attests that Wilhelm affirmatively checked a box to assent to the September 2022 Terms in October 2022. [17-1] ¶¶ 26, 43. While Wilhelm argues BAM offers limited details regarding this process, [23] at 7, she presents no evidence to deny she did this.

As for the August 2023 Terms, BAM does not contend that Wilhelm expressly manifested her agreement to them. It contends instead that it retained the right to propose amendments that would take effect if they were communicated to Wilhelm by email or online and if she took no affirmative steps to reject them, such as by cancelling her use of services and Binance account. [17] at 10.

Wilhelm argues that BAM failed to provide her sufficient notice of the August 2023 Terms because BAM "does not suggest that Plaintiff checked any type of box to indicate her assent." [23] at 7–8. Wilhelm focuses her argument on how BAM's posting of the Terms to its website fails to provide reasonable notice. *Id.* at 8. But BAM does not rely solely on its posting of the amended Terms to Binance's website— BAM argues that it provided proper notice when it emailed Wilhelm the August 2023 Terms. [24] at 12–13.

BAM presents evidence that its "practice was to send an email notification to all Binance.US registered users, including Plaintiff, every time it updated the Terms." [17-1] ¶ 56. Binance also submits "the email notification[s]" sent in connection with the August 2023 Terms, which "alert[ed] all users, including Plaintiff, to the … update." [17-1] ¶¶ 59–60.

Wilhelm argues that the emails are generic, addressed to "${Customer_Name}," and don't show that BAM sent the emails specifically to her. [23] at 9; [17-11] at 2. But Illinois law recognizes that "the sending of a communication can be shown by evidence of corroborating circumstances tending to establish the fact that the custom as to [sending] has been followed in a particular case." *Kass*, 75 F.4th at 704 (quotation omitted). BAM's COO provides the needed evidence about both BAM's usual practice in emailing amended Terms and the use of that practice with the August 2023 Terms. *See id.* (holding similar declarations attesting to defendant's practice of sending updated terms via email was sufficient to support a presumption email was actually sent to plaintiff).

Wilhelm has not offered evidence contradicting BAM's evidence tending to show that the email was likely sent to her. As BAM's evidence shows the emails were properly sent, I presume that they were received under Illinois's mailbox rule. *See Kass*, 75 F.4th at 702. This "presumption is not conclusive and may be rebutted by evidence that the correspondence was not received by the addressee." *Id.* "Under Illinois law, if the addressee denies receiving the communication, the presumption is rebutted," and whether the communication was received "becomes a question of fact to be decided by the trier of fact." *Id.*

Wilhelm says that she "was not aware, and had no reason to be aware, that Binance created new Terms of Use" in August 2023. [23-1] ¶ 9. BAM argues that this is a legal conclusion. [24] at 8. Not so. Yet while Wilhelm's statement is factual evidence of her personal awareness, it is a general denial not sufficiently specific to

create a material dispute for trial. *See Tinder*, 305 F.3d at 735 (holding plaintiff's assertion that she did "not remember receiving or seeing the [arbitration] brochure" insufficient to raise a genuine issue of fact); *Wilcosky v. Amazon.com, Inc.*, 517 F.Supp.3d 751, 765 (N.D. Ill. 2021) (plaintiffs' general "denials that he has neither 'seen' nor been 'presented with' an arbitration agreement are insufficiently specific to demonstrate a material dispute for trial"); *cf. Kass*, 75 F.4th at 704–05 (holding plaintiff's express denial of receiving an email notifying her of amended arbitration agreement created a genuine issue of fact). Wilhelm offers no evidence that refutes BAM's evidence showing it sent her the August 2023 email and the presumption that she received it.[3]

After receiving the August 2023 Terms, Wilhelm did not stop using Binance's services or close her account, and thus, under the contract, assented to the new terms including the delegation clause. All threshold issues relating to the validity and scope of the arbitration provision must be resolved in arbitration in accord with the parties' agreement. *See Henry Schein*, 586 U.S. at 69.

## C.   Stay of Proceedings and Attorney's Fees

In addition to compelling arbitration, BAM seeks dismissal of these proceedings. [16]. Section 3 of the FAA is unequivocal: District courts "shall on application of one of the parties stay the trial of the action until such arbitration has

---

[3] Wilhelm argues that, even assuming she received that email, it was insufficient notice because "modern consumers … are inundated with a barrage of daily emails from companies such as [BAM]." [23] at 9. Wilhelm offers no legal support for this argument, nor any evidence to suggest that sophisticated consumers of online trading platforms for digital assets are incapable of or even unlikely to notice communications from the platform.

been had in accordance with the terms of the agreement." 9 U.S.C. § 3. District courts have no discretion to dismiss a suit when the parties have agreed to arbitration. *Smith v. Spizzirri*, No. 22-1218, 2024 WL 2193872, at *3 (U.S. May 16, 2024). "[T]he proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008) (affirming district court's treatment of defendant's motion to dismiss as a motion to stay because "by seeking dismissal … based on a binding arbitration clause, … [defendant] successfully invoked the arbitration clause.").

BAM also requests its attorney's fees and costs associated with preparing this motion. [17] at 1 n.1. It argues that Wilhelm had no good faith basis to assert that she is not subject to the arbitration agreement. *Id.* I disagree. BAM cites to two cases. *Id.* In one, the plaintiff "failed to cite even one decision which even weakly support[ed] its position." *Hires Parts Serv., Inc. v. NCR Corp.*, 859 F.Supp. 349, 355 (N.D. Ind. 1994). The other does not explain why awarding fees and costs is justifiable. *Allstate Ins. Co. v. Certain Underwriters at Lloyd's, London*, No. 06 C 1474, 2006 WL 8460938, at *4 (N.D. Ill. June 9, 2006). While Wilhelm did not prevail, she presented a colorable argument that she did not agree to Terms. BAM's request is denied.

## IV.   Conclusion

Defendant's motion to compel arbitration, [16], is granted. Defendant's motion to dismiss and request for attorney's fees and costs, [16], are denied. This case is

stayed pending arbitration. The parties shall file a status report on the progress of arbitration proceedings by September 30, 2024.

ENTER:

Manish S. Shah
United States District Judge

Date: May 20, 2024